**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**GENETTA V. COLEMAN,**

      **Plaintiff,**

**v.**                                  **Case No.: 3:13-cv-23805**

**CAROLYN W. COLVIN,
Acting Commissioner of the Social
Security Administration,**

      **Defendant.**

**MEMORANDUM OPINION**

      This is an action seeking review of the decision of the Commissioner of the Social Security Administration (hereinafter the "Commissioner") denying plaintiff's application for supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f. This case is presently before the Court on the parties' motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 13, 14). Both parties have consented in writing to a decision by the United States Magistrate Judge. (ECF Nos. 7, 8). The Court has fully considered the evidence and the arguments of counsel. For the reasons that follow, the Court finds that the decision of the Commissioner is supported by substantial evidence and should be affirmed.

## I.   **Procedural History**

      Plaintiff, Genetta V. Coleman (hereinafter referred to as "Claimant"), filed for SSI benefits on September 21, 2010, alleging a disability onset of September 1, 2010 due to "scoliosis; spine; chipped disc; arthritis in hips; fibromyalgia; COPD; depression;

tremors; anxiety; heart and valve disease; back and knees; asthma; and formible stenosis along spine."[1] (Tr. at 173). The Social Security Administration ("SSA") denied the application initially and upon reconsideration. (Tr. at 88-90, 99-101). On May 25, 2011, Claimant filed a written request for an administrative hearing, which was held on April 16, 2012 before the Honorable Jerry Meade, Administrative Law Judge ("ALJ"). (Tr. at 36-66). By decision dated May 30, 2012, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 11-31).

The ALJ's decision became the final decision of the Commissioner on July 26, 2013, when the Appeals Council denied Claimant's request for review. (Tr. at 1–5). On September 26, 2013, Claimant brought the present civil action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner filed her Answer and a Transcript of the Proceedings on January 8, 2014. (ECF Nos. 11, 12). Thereafter, the parties filed their briefs in support of judgment on the pleadings. Therefore, this matter is ripe for resolution.

## II.    Claimant's Background

Claimant was 48 years old at the time of the administrative hearing. (Tr. at 41). She has at least high school education and is able to communicate in English. (Tr. at 42, 172). Claimant previously worked as a card clerk; delivery person; inventory clerk; sorter/receptionist; stock clerk/ cashier; and warehouse worker. (Tr. at 174-175).

## III.    Summary of ALJ's Findings

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving disability, defined as the "inability to engage in any substantial gainful

---

[1] As noted by the Honorable Jerry Meade, Administrative Law Judge, in his Decision dated May 30, 2012, Claimant had previously filed a total of six claims for supplemental security income under Title XVI, all of which were denied. (Tr. at 11-12).

activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. 423(d)(1)(A). The Social Security Regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. § 416.920. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 416.920(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. *Id.* § 416.920(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 416.920(e). After making this determination, the next step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to establish, as the final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. *Id.* § 416.920(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant,

considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d. 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review." 20 C.F.R. § 416.920a. First, the SSA evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. If such impairment exists, the SSA documents its findings. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. § 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines the severity of the limitation. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. § 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the SSA compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. 20 C.F.R. § 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual function. 20 C.F.R. § 416.920a(d)(3). The Regulation further

specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

20 C.F.R. § 416.920a(e)(2).

In this case, the ALJ determined that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since September 21, 2010. (Tr. at 14, Finding No. 1). Under the second inquiry, the ALJ found that Claimant suffered from the severe impairments of degenerative disc disease of the lumbosacral spine; osteoarthritis of the left knee; obesity; right carpal tunnel syndrome; bilateral shoulder impingement syndrome; chronic obstructive pulmonary disease ("COPD"); and coronary artery disease. (*Id.*, Finding No. 2). However, the ALJ found that Claimant's allegations of dizziness; bilateral hand tremors; genitourinary issues; fatigability; neck pain; headaches; fibromyalgia; intermittent mid-abdominal pain; vision problems; hearing loss and right-sided tinnitus; sleep disturbance; tooth deterioration; affective mood; and anxiety related disorders were either not medically determinable or were non-severe. (Tr. at 16-21).

At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any impairment contained in the Listing. (Tr. at 21-22, Finding No. 3).  Consequently, the ALJ determined that Claimant had the RFC to:

> [P]erform a range of light work. She can lift and/or carry 20 pounds frequently and 50 pounds occasionally. She can stand and/or walk about four hours total in an eight-hour workday, one hour without interruption. She can sit for about four hours total in an eight-hour workday, two hours without interruption. She can frequently reach and push/pull bilaterally

with the upper extremities. She can occasionally operate foot controls with the left lower extremity. She can occasionally climb ramps/stairs, stoop, kneel, and crouch. She can never climb ladders or scaffolds. She can never crawl. The claimant must avoid hazards such as machinery and heights. She can only have occasional exposure to moving mechanical parts, humidity, wetness, vibration, cold, dusts, odors, gases, and pulmonary irritants such as fumes, odors, dust, gases, and poorly ventilated areas. The claimant can frequently reach with both upper extremities. She can occasionally reach overhead with both upper extremities. She can frequently handle, finger, and feel with the dominant, right upper extremity.

(Tr. at 22-29, Finding No. 4). Based upon the RFC assessment, the ALJ determined at the fourth step that Claimant was unable to perform her past relevant work. (Tr. at 29, Finding No. 5). Under the fifth and final inquiry, the ALJ reviewed Claimant's prior work experience, age, and education in combination with her RFC to determine if she would be able to engage in substantial gainful activity. (Tr. at 30-31, Finding Nos. 6-9). The ALJ considered that (1) Claimant was born in 1963 and was defined as a younger individual; (2) she had at least a high school education and could communicate in English; and (3) transferability of job skills was not material to the disability determination because using the Medical-Vocational Rules as a framework supports a finding that the Claimant is "not disabled," whether or not the Claimant has transferable job skills. (Tr. at 30-31, Finding Nos. 7-9). Given these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ determined that Claimant could perform jobs that exist in significant numbers in the national economy. (Tr. at 30-31, Finding No. 9). At the light level, Claimant could work as a house sitter, non-clerical office helper, or unarmed night watchman; and at the sedentary level, Claimant could work as a surveillance systems monitor, credit card information verifier, or product inspector. (Tr. at 30, Finding No. 9). Therefore, the ALJ concluded that Claimant was not disabled as defined in the Social Security Act. (Tr. at 31 Finding No. 10).

IV.     **Claimant's Challenges to the Commissioner's Decision**

Claimant asserts three challenges to the Commissioner's decision. First, she claims that her impairments in combination obviously equal a listed impairment. Therefore, the ALJ erred at the third step of the sequential process. In particular, Claimant contends that she closely approaches Listing 1.04 (Disorders of the Spine), and meets this listing when her other impairments are considered in conjunction with her back disorder. Second, Claimant alleges that the ALJ failed to perform an adequate credibility analysis. According to Claimant, the ALJ found her to be less than fully credible even though her allegations and the medical evidence were mutually supportive. Third, Claimant argues that the ALJ failed to afford controlling weight to the opinions of Claimant's treating physician, Dr. Wagner, as required by Social Security regulations and rulings.

In response, the Commissioner addresses Claimant's second and third challenges. The Commissioner maintains that the ALJ fully complied with applicable regulations in conducting the credibility analysis. In the Commissioner's view, the ALJ thoroughly discussed Claimant's subjective complaints and compared them to her conservative treatment and relatively mild objective medical findings. In addition, the ALJ properly considered Claimant's activities and other behaviors that were contrary to a finding of disability. As far as the criticism related to the opinions of Dr. Wagner, the Commissioner asserts that the opinions rejected by the ALJ involved Claimant's employability, which are opinions on an issue reserved to the Commissioner. Therefore, D. Wagner's opinions on this matter were not entitled to controlling weight or even special significance. The Commissioner further argues that Dr. Wagner's opinions regarding the severity of Claimant's impairments were extreme in view of his treatment

records, which did not reflect such severe findings.

## V.   **Scope of Review**

The issue before this Court is whether the final decision of the Commissioner denying Claimant's application for benefits is supported by substantial evidence. In *Blalock v. Richardson*, the Fourth Circuit Court of Appeals defined substantial evidence as:

> Evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

483 F.2d 773, 776 (4th Cir. 1972) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The Court will not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Id.* Instead, the Court's duty is limited in scope; it must adhere to its "traditional function" and "scrutinize the record as a whole to determine whether the conclusions reached are rational." *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974). Thus, the ultimate question for the Court is not whether the Claimant is disabled, but whether the decision of the Commissioner that the Claimant is not disabled is well-grounded in the evidence, bearing in mind that "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner]." *Walker v. Bowen,* 834 F.2d 635, 640 (7th Cir. 1987).

## VI.   **Relevant Medical Records**

The Court has reviewed the Transcript of Proceedings in its entirety, including

the medical records in evidence, and summarizes below Claimant's medical treatment and evaluations to the extent that they are relevant to the issues in dispute.

### A. Treatment Records

On November 16, 2006, Claimant presented to Pleasant Valley Neurophysiology Center for nerve conduction studies to investigate complaints of paresthesia in her hands and elbows, left worse than right, for the past four years.  In addition, Claimant complained of some neck pain. (Tr. at 457-459). Robert Lee Lewis, II, M.D., interpreted the results of the studies as normal with no evidence of carpal tunnel syndrome or ulnar neuropathies. (Tr. at 458).

Claimant returned to Pleasant Valley Neurophysiology Center on March 6, 2007, for EMG studies to explore complaints of low back pain that radiated into her left leg, as well as paresthesia in both feet. (Tr. at 451-456). Dr. Lewis also found the results of these studies to be a normal with no evidence of a generalized polyneuropathy, myopathy, or left lumbosacral radiculopathy. However, he could not exclude a small fiber neuropathy. (Tr. at 455).

On December 11, 2008, Claimant underwent a third EMG and nerve conduction study for complaints of left hip pain that radiated down the left leg. (Tr. at 448-450). Dr. Lewis concluded that the nerve conduction studies were within normal limits. There was no evidence of a generalized polyneuropathy; although, once again, he could not exclude a small neuropathy. In addition, Dr. Lewis found no evidence of a left lumbosacral radiculopathy; however, he could not exclude a spinal stenosis. Consequently, Dr. Lewis advised a repeat study within three to six months if Claimant's symptoms continued or worsened. (Tr. at 449).

Claimant presented to James P. Wagner, D.O., on September 28, 2009

complaining of back pain, arthritis pain, and feelings of nervousness and depression. (Tr. at 254). A systems review was positive for wheezing; shortness of breath; cough; depression; anxiety; and smoking. Claimant also indicated that she was susceptible to pneumonia due to prior heart bypass surgery. She specifically requested Xanax for her "nerves." (*Id.*). Claimant's physical examination was unremarkable. Dr. Wagner diagnosed Claimant with an upper respiratory infection, bronchitis, and asthma. The treatment plan included prescriptions for Cipro and Phenergan. (*Id.*).

Dr. Wagner performed a physical examination of Claimant at the request of West Virginia Medicaid on October 12, 2009. (Tr. at 253). Unfortunately, his handwriting is mostly illegible. However, it appears that Dr. Wagner diagnosed Claimant with low back pain; back strain; arthritis of the knees; COPD; asthma; osteoarthritis; and anxiety and depression. He also noted that, without glasses, Claimant's vision was 20/100 in both eyes and, with glasses, was 20/25. (*Id.*).

Two days later, Dr. Wagner performed a Vestibular Autorotation Test ("VAT") and ENGplus, to study Claimant's high frequency horizontal and vertical vestibule-ocular reflex[2]. (Tr. at 243-252). Test results indicated the horizontal gain and phase was within normal limits; however, the high vertical gain indicated VOR overcompensated during motion of the head, which could cause visual-vestibular disturbances with faster movements.   (Tr. at 243). The ENGplus showed an abnormal saccade test result, although this result may not have been clinically significant as a few saccades are generally found in the elderly population. (Tr. at 249). The smooth test and gaze test appeared abnormal while the position tests were found within normal limits and the

---

[2] According to the record, the primary function of the vestibule-ocular reflex ("VOR"), is to stabilize the eyes to allow clear vision during motion, including normal daily life activities such as walking, bending, and turning. The sensation of disequilibrium or dizziness can occur if the VOR does not function properly. (Tr. at 243).

optokenetic responses appeared to be symmetrical. (*Id.*). In addition to administering the tests, Dr. Wagner examined Claimant for complaints of feeling dizzy. (Tr. at 252). He completed a hemodynamic status report which revealed a thirty-beat average. (Tr. at 272). Claimant was advised to follow up for pneumonia vaccine and lab tests were ordered. (Tr. at 252).

Claimant returned to Dr. Wagner on November 2, 2009 complaining of low back pain, GERD, and feelings of dizziness and lightheadedness. (Tr. at 242). A review of systems was positive for shortness of breath; depression; anxiety; and neck pain. Claimant was diagnosed with laryngitis and hypoglycemia. Claimant was prescribed ventilation rehabilitation and provided a glucometer. (*Id.*).

On November 20, 2009, Claimant went to see Dr. Lewis at the Pleasant Valley Neurophysiology Center in follow-up to complaints of low back and left leg pain. (Tr. at 436-440). Claimant reported that the pain had developed over the course of several months and was rated a seven to eight on a ten-point pain scale. (Tr. at 436). She described a constant, aching pain that radiated into her left hip with a waxing and waning feature, indicating that it was most painful in the morning. She told Dr. Lewis the pain increased with bending, lifting, or prolonged standing. She attributed the onset of her low back pain to lifting a heavy object. The left leg pain started several years before the back pain and was constant, moderate, and localized in the hip. (*Id.*). Dr. Lewis reviewed an MRI of Claimant's lumbar spine, noting a left-sided herniated disc at L5-S1, lateral recess stenosis, and evidence of degenerative disc disease. He compared it to a prior MRI taken in April 2008 and found worsening herniation of the L5-S1 disc in addition to an annular tear that appeared to have gotten bigger. A review of systems was positive for fever; chills; chest pain; dyspnea on exertion; swelling of hands, feet, and

ankles; joint pain; muscle weakness; anxiety; and depression. (Tr. at 438). Claimant's mental status examination revealed she was oriented times four; with normal speech; fund of knowledge and awareness of current events were normal; and her memory, including immediate recall and long term recall, was intact. A motor examination was found to be normal in the right and left upper extremities for strength, motor function tone, and muscle bulk. As to the right and left lower extremities, the examination revealed normal motor function tone and muscle bulk. Although the right lower extremity strength was normal, the left lower extremity revealed weakness, with antalgic anterior tibialis weakness. (Tr. at 439). Claimant's gait and station showed left antalgia. Dr. Lewis diagnosed Claimant with lumbar region disc disorder; radiculopathy, lumbosacral; spinal stenosis, lumbar region; left lower pain in limb, stable; skin sensation disturbance in the left hip area, also stable; lumbago in stable condition; meralgia paresthetica; and dizziness and giddiness, without description of vertigo. (Tr. at 339-440). Dr. Lewis discussed the risks and benefits of surgical treatments versus various forms of conservative treatment such as physical therapy or epidural steroids. Claimant informed Dr. Lewis that she preferred to remain on Lyrica, as it did provide some benefit, and she was not able to regularly come to the pain center. (Tr. at 440).

Dr. Lewis performed autonomic testing on November 20, 2009 to investigate Claimant's complaints of syncope, dizziness while taking blood pressure medication, COPD, and bronchitis. (Tr. at 441-443). Claimant complained of "light headedness" and headache while tilted to eight degrees for ten minutes. (Tr. at 441). The reduced R-R variation was suggestive of autonomic dysfunction; however, Dr. Lewis made a notation that medications could contribute to that finding. He saw no evidence of orthostatic hypotension even though Claimant had reported symptoms. (*Id.*).

Claimant returned to Dr. Wagner on November 30, 2009. Claimant complained of a sensation of hearing her heart beat in her ears along with frequent headaches. (Tr. at 241). Claimant reported her glucose reading was slightly up with home readings. A review of systems was negative other than diabetes mellitus and headaches. Claimant was diagnosed with an upper respiratory infection. (*Id.*).

On January 15, 2010, Claimant followed-up with Dr. Robert Lewis for low back and left leg pain. (Tr. at 431-435). She described the pain as aching, constant, waxing and waning in intensity, and radiating into her left hip. (Tr. at 431). She continued to report that the pain was exacerbated with bending, lifting, or prolonged standing. She described the pain in her hip as constant and moderate. (*Id.*). Dr. Lewis noted Claimant reported pain to palpation in the left and right buttocks, although an EMG study of Claimant's legs was normal. Claimant complained of hand paresthesia with weakness that occurred over the last several weeks with no improvement. She also reported occasional lightheadedness. (*Id.*).

Dr. Lewis conducted an EMG nerve conduction study on February 4, 2010, documenting that this was the fourth such test he had performed, with the most recent having been completed in 2008. (Tr. at 444-447). Claimant's primary complaints were hand paresthesia and left hip pain that radiated down the left leg. Dr. Lewis compared the results to the results of the 2008 study, indicating that the current study showed a mild to moderate right carpal tunnel syndrome with evidence of a left carpal tunnel syndrome, ulnar neuropathies, peroneal neuropathies, tibial neuropathies, or a generalized polyneuropathy. Dr. Lewis believed the reduced ulnar sensory nerve action potential amplitudes were non-specific and related to callouses on her hands. Dr. Lewis found no evidence of left lumbosacral radiculopathy, left cervical radiculopathy, or a

myopathy. He could not exclude a small fiber neuropathy or spinal stenosis from this study. (Tr. at 446).

Claimant returned to Dr. Robert Lewis on April 23, 2010 for follow-up of her symptoms of low back and left leg pain. (Tr. at 426-430). Dr. Lewis reviewed the normal EMG study of Claimant legs, as well as the EMG results that showed a mild to moderate right carpal tunnel syndrome, noting, however, that the needle examination revealed only mild changes. (Tr. at 426). Claimant complained of increased knee pain, stating that her knees gave out and indicating that she needed an orthopedic consultation. She reported that although she continued to take Ultram, her low back pain remained. She was not able to arrange for transportation to the pain center for other therapies, though. (Tr. at 426). Claimant further reported that her symptoms of anxiety had decreased. She was receiving treatment at Prestera Centers for Mental Health ("Prestera") and had been placed on Prozac and Trazadone. Her mental status examination was unremarkable. (Tr. at 426-428). Dr. Lewis observed that Claimant was wearing a left knee brace, a right carpel tunnel brace, and a lumbosacral brace. (Tr. at 429). Dr. Lewis examined Claimant's extremities and found normal strength in the right upper extremity, but antalgic weakness in the left upper extremity, particularly in the hand. Both right and left upper extremities had normal tone and muscle bulk. Strength in the right lower extremity was normal, but the left lower extremity was weak. Both right and left lower extremities had normal tone with no muscle atrophy. Claimant's gait and station reflected moderate left antalgia. (*Id.*). Dr. Lewis diagnosed Claimant with lumbar region disc disorder and radiculopathy, lumbosacral, that was stable, but not responsive to treatment; spinal stenosis, lumbar region that appeared stable; left lower limb pain unresponsive to treatment; lumbago, unresponsive to treatment; meralgia paresthetica,

stable; cervical region syndromes, currently stable; stable right carpal tunnel syndrome; resolved contact dermatitis and other eczema; and sprains and strains of the knee and leg. (Tr. at 430). Dr. Lewis ordered x-rays of the knees along with an orthopedic consultation. He prescribed Amrix and instructed Claimant to return in three months. (*Id.*).

On May 4, 2010, Claimant returned to Pleasant Valley Hospital with complaints of swelling in both her legs. The examining physician, Dr. Daniel Trent, remarked that Claimant continued to smoke a pack of cigarettes per day "despite the fact she has been advised to discontinue." (Tr. at 281). Dr. Trent performed a cardiac work-up and ProBNP for congestive heart failure. Although some laboratory enzymes were elevated, Dr. Trent did not believe Claimant was in congestive heart failure. (*Id.*). Claimant's chest x-ray showed changes of COPD, emphysema, and other chronic findings. In order to rule out deep vein thrombosis, Claimant underwent a bilateral lower extremity venous ultrasound. The findings showed normal Doppler flow and compressibility of the right and left common femoral, superficial femoral, and popliteal veins. There was no evidence of DVT. (Tr. at 263). Dr. Trent ordered support hose for Claimant and instructed her to elevate her legs and follow-up with her family physician. (Tr. at 281-282).

Claimant presented to Dr. Robert Lewis on May 21, 2010, for the purpose of receiving trigger point injections for myofascial pain syndrome. Claimant was injected in the region of both the right and left cervical spine. After the injections, Claimant described her pain as two on a ten-point pain scale. (Tr. at 424-425).

Claimant returned to Dr. Wagner on June 8, 2010, complaining of a tingling sensation in her fingers. (Tr. at 238). Claimant's physical examination was

unremarkable. She was diagnosed with COPD, emphysema, and GERD. (*Id.*).

Claimant presented to Dr. Robert Lewis on July 28, 2010 for follow-up of complaints of low back, left leg, and left knee pain. Her description of the pain remained unchanged from prior visits to Dr. Lewis. Claimant told Dr. Lewis she had fallen two weeks earlier, landing on her buttocks. He noted that she was using her old back brace. (Tr. at 418). X-rays of Claimant's knee showed arthritis, and she was given cortisone shots. (*Id.*).

On August 25, 2010, Claimant presented to Prestera for medication management. (Tr. At 354-57). She was seen by Lisa Kearns, Advanced Practice Nurse, who recorded Claimant as having a normal mental status examination and a Global Assessment of Functioning Score of 55.[3] (*Id.*). Claimant reported that she had stopped taking her Prozac about a month earlier and felt more depressed. She had increased her dose of Lyrica, and that helped her sleep. Nurse Kearns restarted Prozac and discontinued Trazodone, which caused Claimant to feel like a "zombie." Claimant was instructed to continue with therapy. (Tr. at 357).

Claimant returned to Dr. Lewis's office on September 1, 2010 with ongoing pain in her back, left leg, left knee, and hip. (Tr. at 412-16). Her review of systems and physical findings were essentially the same as they had been on prior visits. Claimant's

---

[3] The Global Assessment of Functioning ("GAF") Scale is a 100-point scale that rates "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness," but "do[es] not include impairment in functioning due to physical (or environmental) limitations." *Diagnostic Statistical Manual of Mental Disorders*, Americ. Psych. Assoc, 32 (4th Ed. 2002) ("DSM-IV"). In the past, this tool was regularly used by mental health professionals; however, in the latest edition of the *Diagnostic and Statistical Manual of Mental Disorders*, DSM-5, the GAF scale was abandoned in part due to its "conceptual lack of clarity" and its "questionable psychometrics in routine practice." DSM-5 at p. 16. GAF scores between 51 and 60 indicate "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV at 32.

diagnoses remained the same, and Dr. Lewis once again discussed various treatment options with Claimant. After considering her options, Claimant elected to continue with conservative treatment. (Tr. at 416). She was referred to Dr. James Robinson, an orthopedist, and was told to return in four weeks for routine follow-up.

Claimant saw Nurse Kearns at Prestera on September 21, 2010 for medication management. (Tr. at 350-53). She complained of having some trouble with her neighbors, but otherwise was doing pretty well. Her mental status examination was essentially normal, her GAF score was 60, and she was instructed to continue taking her medications. Claimant was diagnosed with Major Depressive Disorder, Recurrent, Moderate; Panic Disorder without Agoraphobia; and Generalized Anxiety Disorder. (Tr. at 352). At her counseling session nine days later, Claimant reported that she was doing better and felt "life is good." (Tr. at 349).

On December 9, 2010, Claimant saw Dr. Wagner for a Medicaid physical. (Tr. at 328). Dr. Wagner documented Claimant's low back pain, which began in 2000, noting that she had scoliosis and a herniated disc. Claimant also had dyspnea, wheezing, and asthma, as well as knee pain likely caused by arthritis.

Claimant underwent an MRI of the cervical spine on April 1, 2011. (Tr. at 342). The radiologist compared the films to Claimant's October 2007 MRI films. He concluded that there was a suggestion of minimal degenerative disc-related findings at C5/C6 and C6/C7. No findings of disc bulging, herniation, spinal or foraminal stenosis or spinal cord abnormalities were appreciated. According to the radiologist, "unremarkable examination is suggested." (*Id.*). Dr. Lewis reviewed the results of the MRI with Claimant on April 5, 2011. (Tr. at 407). She reported that she still had pain in her neck, back, knee, and hands, although she received pain relief from Lyrica.

On September 14, 2011, Claimant followed-up with Dr. Lewis. (Tr. at 402-06). Claimant continued to complain of low back, left leg, knee, and neck pain. She indicated that she had a brace for her symptoms of carpal tunnel syndrome, but she rarely used it. Claimant's examination was essentially the same as her prior examinations, and her diagnoses remained the same. Dr. Lewis suggested physical therapy for her neck pain, but Claimant declined due to her inability to make the appointments. In view of her complaints of bilateral knee pain, Dr. Lewis decided to refer her to an orthopedist. (Tr. at 406).

Claimant returned to Dr. Lewis's office on March 15, 2012 for follow-up of her back, leg, knee, and neck pain. (Tr. at 396-401). Claimant reported that her neck pain was stable; however, she did not feel Lyrica was helping with her pain. She continued to have pain in her knees bilaterally, and she was wearing her carpal tunnel brace more often. Dr. Lewis reviewed Claimant's medical history, medication list, social history, and symptoms. He performed a physical examination, which reflected a normal mental status examination and grossly normal cranial nerves. Claimant's right upper extremity had normal strength, normal tone and muscle bulk, and 2+ reflexes. Her left upper extremity revealed antalgic weakness throughout, especially in the hand, but had normal tone and muscle bulk, with 2+ reflexes. (Tr. at 399-400). Claimant's lower extremities revealed antalgic weakness throughout, but they had normal tone and no evidence of atrophy, with 2+ reflexes. (Tr. at 400). Her gait and station were left antalgic, moderate. Dr. Lewis diagnosed Claimant with lumbar region disc disorder, unresponsive to treatment; radiculopathy, lumbosacral, unresponsive to treatment; spinal stenosis, lumbar region, stable; left lower pain in limb, unresponsive to treatment; lumbago, unresponsive to treatment; meralgia paresthetica, stable; cervical

region syndromes, stable; right carpal tunnel syndrome, worsening; sprains and strains of knee and leg, stable. (Tr. at 400-01). Dr. Lewis decided to wean Claimant from Lyrica and start her on Savella. She was instructed to return in four weeks. (Tr. at 401).

### B. Consultative Assessments and Other Opinions

On December 9, 2010, Dr. James Wagner completed a General Physical Form for the West Virginia Department of Health and Human Resources Medical Review Team. (Tr. at 335-37). He noted that Claimant alleged disability based on low back pain, arthritis, and chronic knee pain. He indicated that Claimant's low back pain was caused by a herniated disc, spinal stenosis, and scoliosis. Dr. Wagner's diagnosis was chronic back pain. He opined that Claimant could not work at her former occupation in a warehouse, and was also unable to perform other fulltime work due to her pain. Dr. Wagner did not believe Claimant would ever be able to work. (Tr. at 336). He did not recommend vocational rehabilitation. Dr. Wagner summarized by stating that Claimant's low back disorder, severe knee pain, anxiety, depression, and panic attacks prevented her from working. (Tr. at 337).

On December 30, 2010, William C. Steinhoff, M.A., performed a clinical interview and mental status examination of Claimant at the request of the SSA. (Tr. at 287-93). Mr. Steinhoff observed Claimant as she arrived to the interview. He described her as sloppily dressed, cooperative, but somewhat restless. Claimant told Mr. Steinhoff that her chief complaints were depression, anxiety, memory problems, and panic attacks. She claimed to have had these problems her "whole life" and stated that she took Valium in third grade. (Tr. at 288). Claimant last worked in 2001 in a warehouse for the Fruth Corporation. Claimant described her current symptoms as poor sleep, crying spells, depression, and panic attacks, especially in traffic, crowds, and stores. She

denied receiving current mental health treatment, although she periodically went to Prestera for outpatient therapy. Claimant reviewed her medical and surgical history, as well as her social, developmental, vocational, and educational histories. (Tr. at 289).

On mental status examination, Mr. Steinhoff found Claimant to be depressed and mildly irritated. Her affect was restricted; her thought process was coherent but slow; her immediate and remote memory was normal, yet her recent memory was markedly impaired. (Tr. at 290). Claimant's processing speed and pace were slow, and her concentration was moderately impaired. Mr. Steinhoff felt Claimant's social functioning was moderately impaired. He noted that Claimant was very vague in describing her daily activities. She indicated that she spent part of the day taking care of the household and watching television. Claimant lived with her adult children, and they shared chores like doing the laundry, washing the dishes, and cooking. (Tr. at 290). Claimant also listened to music, read, and wrote stories. (Tr. at 291). Mr. Steinhoff diagnosed Claimant with Major Depressive Disorder, Recurrent, Moderate, Chronic and Panic Disorder without Agoraphobia. (*Id.*). He opined that Claimant's prognosis was guarded given the chronic nature of her symptoms; however, he felt she was capable of managing her own finances.

On December 31, 2010, Dr. Robert Holley, an agency consultant, performed a physical examination and assessment of Claimant at the request of the SSA. (Tr. at 294-304). Claimant provided Dr. Holley with her medical history. She told him that she had undergone three cardiac catheterizations, all of which were normal. She had two arthroscopies of her left knee. An MRI of the lumbar spine two months earlier showed scoliosis, degenerative disc disease, spinal stenosis, herniated disc at the L4, and fracture at the L5. Dr. Holley conducted a review of systems, eliciting a number of

complaints from Claimant involving her cardiac, musculoskeletal, and neurological systems. (Tr. at 295). He then performed a physical examination. Dr. Holley noted that Claimant's musculoskeletal examination revealed tenderness of the knees bilaterally, although without red, hot, swollen joints, clicking, or locking of joints. Her range of motion testing showed some abnormalities in both upper and lower extremities. (Tr. at 297). Claimant had reduced shoulder flexion on the right, reduced abduction on the left, but 90 degrees external rotation on both sides. Dr. Holley also checked Claimant's elbows, wrists, and hands. Of particular note, he found that Claimant could fully extend her hands and could make a fist. She had normal fine manipulation and equal grip strength bilaterally. In the lower extremities, Claimant displayed some limitations in the left knee and left hip, but she had equal muscle strength bilaterally. Claimant was able to heel and toe walk without difficulty and partially squat. She could ambulate without an assistive device and experienced only normal difficulty mounting and dismounting the examination table. (Tr. at 297). Dr. Holley diagnosed Claimant with COPD; recurrent tachycardia; chest pain, etiology unknown; abdominal pain; metabolic syndrome; bilateral lumbar radiculopathy; chronic daily headaches; depression; anxiety; hyperlipidemia; myopia; hypertension; cardiovascular disease; fibromyalgia; bilateral shoulder impingement; osteoarthritis of the left knee, lumbar spine, and cervical spine; and scoliosis. (*Id.*).

Frank Roman, Ed.D., completed a Psychiatric Review Technique on January 12, 2011. (Tr. at 305-18). He determined that Claimant had evidence of an affective disorder (depression) and an anxiety-related disorder, but he did not feel that Claimant had a severe mental impairment. Dr. Roman opined that Claimant had only mild limitations in her activities of daily living, ability to maintain social functioning, and in maintaining

concentration, persistence, and pace. (Tr. at 315). He found no evidence of episodes of decompensation of extended duration, or of paragraph C criteria. Dr. Roman's assessment was affirmed on a second review performed by Jeff Harlow, Ph.D., who commented on May 14, 2011 that there was no evidence of additional mental illness, or treatment for mental illness since Dr. Roman's assessment. (Tr. at 348).

On January 13, 2011, Dr. Rogelio Lim completed a Physical Residual Functional Capacity Assessment. (Tr. at 319-26). Based upon his review of the file and Dr. Holley's examination, Dr. Lim opined that Claimant was capable of lifting and carrying 50 pounds occasionally and 25 pounds frequently; she could stand or walk about 6 hours in an eight-hour workday and sit 6 hours, as well; and she had unlimited ability to push and pull, including the operation of hand and foot controls. Dr. Lim felt Claimant could only occasionally climb, balance, stoop, kneel, crouch, and crawl, but she had no manipulative, visual, or communicative limitations. (Tr. at 321-23). Environmentally, Claimant needed to avoid concentrated exposure to extreme temperatures, fumes, odors, dusts, gases, poor ventilation, and hazards. Dr. Lim did not find Claimant to be fully credible in describing the intensity and persistence of her symptoms, indicating that her statements were out of proportion to the objective findings. (Tr. at 326). On May 2, 2011, Dr. A. Rafael Gomez reviewed all of the evidence in the file and affirmed the opinions of Dr. Lim. (Tr. at 347).

**VII.   <u>Discussion</u>**

Having thoroughly considered the record, the Court concludes that none of Claimant's challenges to the Commissioner's decision has merit. Claimant firmly believes that the combination of her impairments is sufficiently severe to qualify her as disabled; nonetheless, in order to meet a listing, she must demonstrate that she satisfies

the listing's specific severity criteria. Claimant has not met that burden.  Similarly, while Claimant argues that the ALJ did not perform a fair credibility assessment because Claimant's allegations plainly correspond with the objective evidence, Claimant fails to appreciate that as long as the ALJ properly follows the two-step process in analyzing the credibility of Claimant's statements and identifies substantial evidence in the record that supports his determination, the Court will not replace its own conclusion for that of the ALJ. Because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984). Lastly, although Claimant correctly states the treating physician rule, the rule is inapposite here because the opinions in dispute pertain to matters that are administrative in nature.

The undersigned addresses each challenge in more detail as follows.

### A.  Listing Level Impairment

Claimant's first challenge is based on her belief that her impairments, in combination, are presumptively disabling. In particular, Claimant maintains that her back disorder closely approaches Listing 1.04[4] (Disorders of the Spine), and when considered in conjunction with her other health problems, clearly equals that listed impairment. (ECF No. 13 at 5).

A determination of disability should be made at step three of the sequential evaluation

---

[4] Listing 1.04 pertains to disorders of the spine resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or

B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or

C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

when a claimant's impairments meet or medically equal an impairment included in the Listing. The purpose of the Listing is to describe "for each of the major body systems, impairments which are considered severe enough to prevent a person from doing any gainful activity." *See* 20 C.F.R. § 404.1525. Because the Listing is designed to identify those individuals whose medical impairments are so severe that they would likely be found disabled regardless of their vocational background, the SSA has intentionally set the medical criteria defining the listed impairments at a higher level of severity than that required to meet the statutory standard of disability. *Sullivan v. Zebley,* 493 U.S. 521, 532, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990). To qualify for the presumptive disability that accompanies a listed impairment, a claimant is required to show that his impairment or combinations of impairments meets all of the criteria set out in the listing. *Sullivan*, 493 U.S. at 530 ("For a claimant to show that his impairment matches a [listed impairment], it must meet *all* of the specified medical criteria."). If the claimant is unable to demonstrate that his impairments, alone or in combination, match the criteria of a particular listed impairment, the claimant may still establish disability by showing that his impairments are medically equivalent to the listed impairment.

To establish medical equivalency, a claimant must present evidence that his impairment, unlisted impairment, or combination of impairments, is equal in severity and duration to all of the criteria of a specific listed impairment. *Id.* at 520; *see also* 20 C.F.R. § 416.926. In Title 20 C.F.R. § 416.926, the SSA sets out three ways in which medical equivalency can be determined. First, if the claimant has an impairment that is described in the Listing, but (1) does not exhibit all of the findings specified in the listing, or (2) exhibits all of the findings, but does not meet the severity level outlined for each and every finding, equivalency can be established if the claimant has other findings

related to the impairment that are at least of equal medical significance to the required criteria. *Id.* § 416.926(b)(1). Second, if the claimant's impairment is not described in the Listing, equivalency can be established by showing that the findings related to the claimant's impairment are at least of equal medical significance to those of a similar listed impairment. *Id.* § 416.926(b)(2). Finally, if the claimant has a combination of impairments, no one of which meets a listing, equivalency can be proven by comparing the claimant's findings to the most closely analogous listings; if the findings are of at least equal medical significance to the criteria contained in any one of the listings, then the combination of impairments will be considered equivalent to the most similar listing. *Id.* § 416.926(b)(3). "For a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments is 'equivalent' to a listed impairment, he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment ... A claimant cannot qualify for benefits under the 'equivalency' step by showing that the overall functional impact of his unlisted impairment or combination of impairments is as severe as that of a listed impairment." *Sullivan*, 493 U.S. at 531.

In the present case, the ALJ determined that Claimant had the following medically determinable impairments: degenerative disc disease of the lumbosacral spine; osteoarthritis of the left knee; obesity; right carpal tunnel syndrome; bilateral shoulder impingement; COPD; coronary artery disease; mild degenerative cervical disc disease; mild hearing loss; mild vision loss; and non-severe affective mood and anxiety-related disorders. The ALJ specifically examined Claimant's combination of impairments in relation to the severity criteria of Listing 1.04 and concluded that Claimant did not meet or equal that listed impairment. The ALJ noted that Listing 1.04

required the presence of nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis to certain designated degrees, and Claimant did not have evidence in the record to satisfy the requisite criteria. Claimant does not identify any treatment notes or medical findings that undermine the ALJ's assessment, nor does she explain in what way her other impairments supplement the evidence associated with her back disorder to meet Listing 1.04. Medical imaging studies of Claimant's lumbosacral spine did not demonstrate nerve root compression or spinal arachnoiditis, and Claimant was never diagnosed with either of these conditions. In fact, Claimant had negative straight leg raising tests, normal motor tone, and no muscle atrophy. (Tr. at 297, 420). Claimant was diagnosed with spinal stenosis; however, to meet Listing 1.04, the stenosis must manifest as chronic *nonradicular* pain and weakness, result in pseudoclaudication, and an inability to ambulate effectively. In Claimant's case, her lateral spinal stenosis was secondary to a herniated disc and was associated with lumbosacral radiculopathy. (Tr. at 417, 422). Although Claimant's gait was described as "antalgic," (Tr. at 421), she was able to ambulate effectively and without a prescribed assistive device. (Tr. at 297). Consequently, the ALJ correctly concluded that Claimant did not meet or equal Listing 1.04.

Therefore, the Court **FINDS** that the ALJ did not err at step three of the sequential disability determination process.

### B. Credibility Assessment

Social Security regulations and rulings require an ALJ to evaluate the credibility of a claimant's statements concerning pain using a two-step process. 20 C.F.R. § 416.929. First, the ALJ must evaluate whether the claimant's medically determinable medical and psychological conditions could reasonably be expected to produce the

claimant's alleged pain. *Id.* § 416.929(a). A claimant's "statement about his or her symptoms is not enough in itself to establish the existence of a physical or mental impairment or that the individual is disabled." SSR 96-7p, 1996 WL 374186, at *2. Instead, there must exist some objective "[m]edical signs and laboratory findings, established by medically acceptable clinical or laboratory diagnostic techniques" which demonstrate "the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. § 416.929(b).

Second, after establishing that the claimant's impairments could be expected to produce the alleged pain, the ALJ must evaluate the intensity, persistence, and severity of the pain to determine the extent to which it prevents the claimant from performing basic work activities. *Id.* § 416.929(a). If the intensity, persistence or severity of the pain cannot be established by objective medical evidence, the ALJ must assess the credibility of any statements made by the claimant to support the alleged disabling effects. SSR 96-7P, 1996 WL 374186, at *2. In evaluating a claimant's credibility regarding his or her symptoms, the ALJ will consider "all of the relevant evidence," including (1) the claimant's medical history, signs and laboratory findings, and statements from the claimant, treating sources, and non-treating sources, *id.* § 416.929(c)(1); (2) objective medical evidence, which is obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, *id.* § 416.929(c)(2); and (3) any other evidence relevant to the claimant's symptoms, such as evidence of the claimant's daily activities, specific descriptions of symptoms (location, duration, frequency and intensity), precipitating and aggravating factors, medication or medical treatment and resulting side effects received to alleviate symptoms, and any other factors relating to functional

limitations and restrictions due to the claimant's symptoms. *Id.* § 416.929(c)(3); *see also Craig v. Chater*, 76 F.3d 585, 595 (4th Cir. 1996); SSA 96-7P, 1996 WL 374186, at *4-5. In *Hines v. Barnhart*, the Fourth Circuit Court of Appeals stated that:

> Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges he suffers.

453 F.3d at 565 n.3 (citing *Craig*, 76 F.3d at 595). The ALJ may not reject a claimant's allegations of intensity and persistence solely because the available objective medical evidence does not substantiate the allegations; however, the lack of objective medical evidence may be one factor considered by the ALJ. SSR 96-7P, 1996 WL 374186, at *6.

Social Security Ruling 96-7p provides further guidance on how to evaluate a claimant's credibility. For example, "[o]ne strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record." *Id.* at *5. Likewise, a longitudinal medical record "can be extremely valuable in the adjudicator's evaluation of an individual's statements about pain or other symptoms," as "[v]ery often, this information will have been obtained by the medical source from the individual and may be compared with the individual's other statements in the case record." *Id.* at *6-7. A longitudinal medical record demonstrating the claimant's attempts to seek and follow treatment for symptoms also "lends support to an individual's allegations ... for the purposes of judging the credibility of the individual's statements." *Id.* at *7. On the other hand, "the individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints." *Id.* Ultimately, the ALJ "must consider the entire case record and give

specific reasons for the weight given to the individual's statements." *Id.* at *4. Thus, the reasons given for the ALJ's credibility assessment "must be grounded in the evidence and articulated in the determination or decision." SSR 96-7p, 1996 WL 374186, at *4.

When considering whether an ALJ's credibility determinations are supported by substantial evidence, the Court does not replace its own credibility assessments for those of the ALJ; rather, the Court studies the evidence to determine if it is sufficient to support the ALJ's conclusions. In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence, reach independent determinations as to credibility, or substitute its own judgment for that of the Commissioner. *Hays*, 907 F.2d at 1456. Because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984).

Claimant contends that the ALJ erred when he found her to be less than credible given that her allegations and the objective medical evidence were mutually supportive. However, the ALJ fully examined the medical evidence and specifically pointed out how the objective findings contradicted the degree of symptoms alleged by Claimant. First, the ALJ observed that Claimant testified of experiencing severe mental health problems, but the evidence indicated her symptoms were not as severe as she alleged. Claimant was not receiving any treatment and had only attended two counseling sessions in 2010. (Tr. at 23). Records from the one of those sessions reflected that Claimant was doing better, that she was writing novels and had found a publisher, and her GAF score was 60. Thus, the ALJ's conclusion was supported by substantial evidence. Indeed, the agency consultants reviewed the evidence and determined that Claimant's mental

impairments were non-severe. (Tr. at 305, 348).

Second, the ALJ noted that Claimant complained of neck pain, but her treatment records reflected stable findings. (Tr. at 24). EMG study results and imaging reports were likewise benign. In addition, Claimant had a brace for carpal tunnel syndrome, but rarely wore it. The ALJ discussed Claimant's prior SSI applications, stressing that Claimant had unsuccessfully sought benefits since 2002. (Tr. at 23). According to the ALJ, the Claimant was most recently found not disabled in January 2010, and she had not produced evidence demonstrating any significant medical worsening since that time. The ALJ commented on the conservative treatment received by Claimant, consisting of medication, home exercises, the use of a TENS unit, and the occasional use of braces. He noted that Claimant repeatedly declined more aggressive therapies. (Tr. at 24). The ALJ conceded that an MRI reflected slight worsening of herniated disc in Claimant's lumbar spine, which has a larger annular tear, but added that Claimant had not been referred to a neurosurgeon, and there was no other clinical or diagnostic evidence of a more advanced process. Examining her knee complaints, the ALJ indicated that Claimant had no significant treatment in the years since her arthroscopy. Clinical findings were mild. Although Claimant used a cane, this device was not prescribed, and Claimant could ambulate without it. (Tr. at 25). The ALJ felt that restrictions could be included in the RFC finding to account for all of these limitations. In addition, the ALJ addressed Claimant's alleged pulmonary problems. He emphasized that Claimant continued to smoke despite complaining of shortness of breath and difficulty breathing. Moreover, notwithstanding her habit of smoking, Claimant's pulmonary function studies were not particularly alarming; her oxygen saturation levels were satisfactory, and there was no evidence of Claimant requiring acute emergent care

or inpatient stabilization. (Tr. at 25-26).

When looking at the records as a whole, the ALJ found multiple instances in which Claimant obtained relief from her symptoms with medication and conservative treatment and numerous occasions on which Claimant declined more aggressive workup and therapies. (Tr. at 26). Based on these records, the lack of any significant change since Claimant's last denial of benefits, and the assessments of the agency experts, the ALJ found Claimant's testimony and subjective complaints to be exaggerated and disproportionate to the objective evidence. Contrary to Claimant's contention, the objective medical evidence does not clearly support the degree of limitation she alleges, and the ALJ's conclusion is thoroughly explained and substantially supported by the evidence as a whole.

Therefore, the Court **FINDS** that the ALJ's credibility analysis fully complied with the Social Security regulations and rulings and is supported by substantial evidence.

### C.  ALJ's Consideration of Treating Source Opinion

Finally, Claimant argues that the ALJ failed to fairly consider the opinions of her treating physician, Dr. James Wagner, who stated that "due to her many problems," Claimant is "unemployable" and "probably can never work." (ECF No. 13 at 6). Claimant asserts that as a treating physician, Dr. Wagner's opinions should have been given controlling weight.

20 C.F.R. § 416.927(d) outlines how medical opinions will be weighed in determining whether a claimant qualifies for disability benefits.  In general, the Social Security Administration will give more weight to the opinion of an examining medical source than to the opinion of a non-examining source.  *See Id.* § 416.927(d)(1).  Even

greater weight will be allocated to the opinion of a treating physician, because that physician is usually most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *See Id.* § 416.927(d)(2). Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." *Ward v. Chater*, 924 F. Supp. 53, 55 (W.D. Va. 1996); *see also*, 20 C.F.R. § 416.927(d)(2).

The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits. 20 C.F.R. § 416.927(d)(2). If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in *Id.* § 416.927(d)(2)-(6).   These factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) various other factors.  "A finding that a treating source's medical opinion is not entitled to controlling weight does not mean that the opinion is rejected.  It may still be entitled to deference and be adopted by the adjudicator."  SSR 96-2p.  Ultimately, it is the responsibility of the Commissioner, not the court, to evaluate the case, make findings of fact, and resolve conflicts of evidence.  *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). When a treating source's opinion is not given controlling weight, and the opinions of agency experts are considered, the ALJ "must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician or psychologist as the [ALJ] must do for any opinions from treating sources, nontreating sources, and other nonexamining sources. 20 C.F.R. §

416.927.  The regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." *Id.* § 416.927(d)(2).

Medical source opinions on issues reserved to the Commissioner are treated differently than other medical source opinions. *Id.* § 416.927(e).  In both the aforestated regulations and Social Security Ruling 96-5p, the SSA addresses how medical source opinions are considered when they encroach upon these "reserved" issues; for example, opinions on "whether an individual's impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the Listing of Impairments in appendix 1, subpart P of 20 CFR part 404 (the listings); what an individual's residual functional capacity (RFC) is;. . . . and whether an individual is 'disabled' under the Social Security Act. . ." Opinions concerning issues reserved for the Commissioner are never entitled to controlling weight or special significance, because "giving controlling weight to such opinions would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine when an individual is disabled."  SSR 96-5p at 2.  However, these opinions must always be carefully considered and "must never be ignored."  *Id.*

The ALJ explicitly addressed Dr. Wagner's statements that Claimant was "unemployable" and would "probably never [be] able to work," and afforded them little weight for two reasons. (Tr. at 27). First, the ALJ correctly observed that these opinions encroached on issues reserved to the Commissioner, and as such, they were not entitled to special significance or weight. In essence, rather than rendering a medical source opinion, Dr. Wagner was making an administrative finding outside of his bailiwick.

Second, the ALJ found the statements to be unsupportable in light of the modest clinical findings and observations in the record. The ALJ pointed out that Dr. Wagner provided no rationale for his bald statements besides indicating that Claimant had a "guarded" gait. (Tr. at 27-28). Furthermore, Dr. Wagner never placed any restrictions on Claimant's activities, and his own treatment notes reflected minimal findings. The ALJ concluded that Dr. Wagner must have relied too heavily on Claimant's subjective reports in making these statements.

A review of the written opinion substantiates that the ALJ meticulously reviewed the evidence, including Dr. Wagner's clinical records and his disability opinions, and identified conflicts between the opinions and the rest of the record. Concluding that Dr. Wagner's finding of disability was incompatible with Claimant's minimal clinical findings and relatively stable diagnostic testing results and with her conservative treatment course, the ALJ exercised his right to give little deference to these opinions. As previously stated, under SSR 96-5p, 1996 WL 374183 *2, opinions on issues reserved to the Commissioner, such as whether a claimant is unemployable or unable to work, are not entitled to controlling weight. Similarly, opinions of treating physicians that are not well-supported by diagnostic and clinical findings, or are inconsistent with other substantial evidence, are not entitled to controlling weight. Instead, these opinions are assessed in relation to the record as a whole to determine their consistency and supportability. When there are inconsistencies in the record, the ALJ is charged with the duty of resolving the conflicts. If the ALJ completes this task in accordance with the applicable rules and regulations, and the ultimate finding is supported by evidence which a reasoning mind would accept as sufficient, the Court may not substitute its judgment for that of the ALJ.

Here, substantial evidence supports the ALJ's decision to discredit Dr. Wagner's disability opinions. The medical records simply do not support the level of incapacity conveyed by Dr. Wagner in his two unsupported statements. Moreover, the record suggests, as the ALJ found, that Dr. Wagner's assessment was based in large part on Claimant's subjective reports rather than on an impartial review of the objective medical evidence. The ALJ provided a clear explanation for his decision.

Therefore, the Court **FINDS** that the ALJ acted appropriately in the manner in which he evaluated and weighed Dr. Wagner's opinions on Claimant's employability.

## VIII.  <u>Conclusion</u>

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision **IS** supported by substantial evidence. Therefore, by Judgment Order entered this day, the final decision of the Commissioner is **AFFIRMED** and this matter is **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to transmit copies of this Order to the Plaintiff and counsel of record.

**ENTERED**: February 23, 2015

_____
Cheryl A. Eifert
United States Magistrate Judge

35